IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | **CRIMINAL NO. JKB-20-0269** |
| **JEROLD GILLIAM,** | |
| Defendant. | |

**RESPONSE IN OPPOSITION TO DEFENDANT'S
APPEAL OF ORDER OF DETENTION**

On February 5, 2021, the Defendant, Jerold Gilliam, filed an Appeal of Order of Detention, ECF 123, seeking release from pretrial custody. On September 16, 2020, Mr. Gilliam appeared before the Honorable A. David Copperthite for a detention hearing. At the conclusion of the contested hearing, and after considering the factors set forth in 18 U.S.C. § 3142(g), Judge Copperthite entered an order of detention pending trial. ECF 28. Mr. Gilliam now appeals the detention order, pursuant to 18 U.S.C. § 3145(b), and seeks his pretrial release.

The Motion should be denied. Consideration of the factors relevant to the detention analysis, as set forth in 18 U.S.C. § 3142(g), supports Judge Copperthite's conclusion that there is no condition or combination of conditions of release that would reasonably assure the safety of the community if Mr. Gilliam were to be released. The charges against Mr. Gilliam create a statutory presumption that that there are no conditions of release that would reasonably assure the safety of the community. Silent as to this statutory provision, the motion fails to grapple with and rebut this consideration as well as other relevant facts. Mr. Gilliam's history of drug trafficking convictions

1

and probation violations tips the scales further against release. As such, the balance of factors weighs in favor of detention.[1]

## BACKGROUND

Mr. Gilliam and eight other individuals are charged in an indictment alleging a conspiracy to distribute and possess with intent to distribute 400 or more grams of a mixture or substance containing fentanyl and an unspecified quantity of cocaine base, in violation of 21 U.S.C. § 846 (Count One), and related charges. Mr. Gilliam is also charged with possession with intent to distribute a mixture or substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. § 841(a) (Count Twelve).

Federal agents arrested Mr. Gilliam on September 14, 2020 and brought him before United States Magistrate Judge Copperthite for an initial appearance. Two days later, Judge Copperthite heard argument as to whether Mr. Gilliam should be released pending trial. Judge Copperthite then entered an order of detention after finding no condition or combination of conditions could reasonably assure the community's safety. ECF 28.

On February 5, 2021, Mr. Gilliam filed the pending appeal of Judge Copperthite's order. He argues that the "order was substantially flawed" it its conclusions regarding the absence of conditions to meet the standards of the Bail Reform Act. ECF 123 at 3. He also cites pre-existing medical conditions relevant to the present COVID-19 pandemic, his ties to the community, and a

---

[1] While referencing the current COVID-19 outbreak at Mr. Gilliam's detention facility, the appeal does not appear to invoke the temporary release mechanism in 18 U.S.C. § 3142(i), the usual method through which courts assess COVID-19 within the pretrial release analysis. *See, e.g., United States v. Gallagher*, SAG-19-479, 2020 WL 2614819, at *3 (D. Md. May 22, 2020). To the extent the Court finds the current outbreak relevant to the stated basis for appeal, this consideration would still be balanced with other aspects of the danger analysis required by 18 U.S.C. § 3142(g). *Id.*

proposed third-party custodian. Nothing other than the proposed custodian's identity differs materially from the facts available and considered at the time of the initial detention hearing.

## ARGUMENT

A consideration of the 18 U.S.C. § 3142(g) factors weighs in favor of pre-trial detention in this case. Considering all the relevant information—the nature and circumstances of the offense, Mr. Gilliam's involvement, his criminal history, and danger posed by his release—the Court should agree with the original detention order. While not strictly relevant to the provisions Mr. Gilliam invokes, the government is aware that the appeal arrives against the background of the recent spread of COVID-19 at the facility where Mr. Gilliam is detained, the Chesapeake Detention Facility (CDF). Even so, the health risks posed to the Defendant by his continued detention at CDF do not outweigh the danger that he would pose to the community if released pending his trial. Indeed, the relevant health and other physical attributes were known and considered at the time of the original detention hearing. The Court should therefore deny the motion to revoke the detention order and the request for release.

I. **Legal Standards**

The appeal seeks review of the magistrate judge's detention order under 18 U.S.C. § 3145(b). In considering such an appeal, the District Court reviews the magistrate judge's detention order de novo. *United States v. Stewart*, 19 Fed. App'x 46, 47 (4th Cir. 2001).

Under 18 U.S.C. § 3142(e), a defendant shall be ordered detained pending trial if the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is required if the Court finds that either the defendant poses a risk of flight or a danger to the community (or both). *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985)

(citations omitted) ("The lack of reasonable assurance of either the defendant's appearance or the safety of others or the community is sufficient; both are not required.").

Further, 18 U.S.C. § 3142(e) provides that:

it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed –

(A)   an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.).

18 U.S.C. § 3142(e)(3)(A).  The rebuttable presumption in Section 3142(e) shifts to the defendant the burden of producing evidence that he is not a flight risk and not a danger to the community. *See United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992).

"In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," a court is required by law to consider the factors set forth in 18 U.S.C. § 3142(g), which are "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

As Judge Gallagher has explained, a defendant's medical condition, and the related risks posed to the defendant by incarceration, do not "fall within the factors appropriately considered in the context of § 3142(g)" unless they have some effect on "the defendant's risk of flight or danger

4

to the community." *United States v. Gallagher*, SAG-19-479, 2020 WL 2614819, at *3 (D. Md. May 22, 2020) (collecting cases).[2]

## II. The Section 3142(g) factors did, and still do, favor detention.

In this case, an examination of the Section 3142 factors demonstrates that the detention order should remain in place. All four Section 3142(g) factors favor detention. Combined with the presumption afforded to the alleged violations of the Controlled Substance Act—which Mr. Gilliam neither references nor addresses—the Court should find that Mr. Gilliam fails to carry his burden to rebut the presumption of detention.

### A. The nature and circumstances of the offenses, and weight of the evidence against Mr. Gilliam

The allegations arise from a long-term investigation, beginning in the summer of 2019, into various drug trafficking organizations (DTOs) operating in and around the Penn-North section of Baltimore City—the area surrounding the intersection of Pennsylvania and North avenues in West Baltimore. Law enforcement agents employed a variety of investigative techniques, including wire and electronic interceptions, controlled purchases of narcotics, confidential sources, GPS tracking of vehicles, and search and seizure warrants. The combination of techniques led to identification of Mr. Gilliam as the suspected leader of a street-level DTO operating under the moniker "Bullseye," which was the term associated with the controlled dangerous substances (CDS) sold by group members and associates.

---

[2] The Court recognized that "the COVID-19 pandemic is relevant in the assessment of whether a defendant's temporary release might be appropriate under § 3142(i), and will be considered fully in that context, in accordance with the Fourth Circuit's order in *United States v. Gary Creek* . . . ." *Gallagher*, 2020 WL 2614819, at * 4. However, Mr. Gilliam's appeal does not cite the temporary release provision in 18 U.S.C. § 3142(i) (or even the word "temporary") or reference the factors set forth in the Fourth Circuit's *Creek* decision and applied by the Court to "compelling reason" arguments under that provision. This response does not address facts relevant to the temporary release analysis that are not otherwise relevant to the § 3142(g) factors.

Three of the intercepted phones were used by two individuals—Charles Bond and CC1[3]—who directly sold narcotics advertised as "Bullseye" and otherwise participated in operations associated with "Bullseye," such as managing stash houses, resupplying and/or supervising street-level sellers, and handling proceeds from street level sales. Some of the intercepted calls involved or referenced Mr. Gilliam, identified by investigators through his phone number or speakers' references to nicknames identified by confidential or other sources as pertaining to Mr. Gilliam ("Roddy" or "Big Head"). For example:

- On October 7, 2019, CC1 tells co-defendant James Meekins that "Big Head" wants to speak with Meekins. Two minutes later, investigators using closed circuit television cameras observe Mr. Gilliam standing outside of Meekins' apartment building with a bulge in his shirt, handing out suspected CDS to other identified DTO members. Meekins soon emerges from the building to meet Gilliam, the two go inside, and Gilliam leaves the building and the area minutes later, without the bulge.
- Later on October 7, 2019, Gilliam approaches Meekins' apartment building with a black bag and leaves about ten minutes later. Meekins then calls CC1 and says that "Roddy . . . just . . . dropped something else on me." Meekins then mentions giving a pack of CDS to a DTO worker who had recently been stopped by law enforcement.
- On multiple dates, CC1 discussed with various individuals the need for or arranging of a resupply of packs of CDS. Some of these conversations involved references to Gilliam or observation of Mr. Gilliam driving to the discussed resupply location and then leaving after a few minutes, consistent with investigators' training and experience about drug trafficking operations.
- Reflecting Gilliam's managerial role, on October 16, 2019, CC1 explains to another individual that "Roddy", i.e. Mr. Gilliam, authorized co-defendant Isaiah Timms to work for the DTO that day.
- In late October 2019, CC1 calls Gilliam on consecutive days to exchange items believed to be firearms. On October 24, CC1 asks if Mr. Gilliam needs "something like what I [CC1] got" for $300. Mr. Gilliam responds affirmatively, and CC1 later says s/he can leave the item at another location because CC1 was already "heavy." The next day, the two again discuss a drop-off. Mr. Gilliam says not to drop "it" off to him because he was out at another location and does not "know where to take it." CC1 agrees to take it to another location because s/he and co-

---

[3] CC1 refers to an individual whose name remains under seal and thus redacted from the public docket and indictment.

> defendant Marquese Ward were "heavy" and wanted to know what Mr. Gilliam wanted to do with "it." As noted in affidavits and other filings with the Court, investigators interpreted the references of being "heavy" as references to firearms, thus concluding that the item that CC1 acquired for and attempted to provide to Mr. Gilliam was a firearm.

As relevant context to these conversations, it should be noted that investigators, through undercover agents or confidential sources, conducted controlled purchases of fentanyl from CC1 and cocaine from Meekins. Also, CC1 was present during execution of multiple search warrants leading to recoveries of more than 400 grams of fentanyl. During one execution, CC1 and co-defendant Trevor Connors were found in a connected bedroom and bathroom containing more than 300 grams of fentanyl and a firearm.

At other times, investigators observed Gilliam meeting individuals at identified stash locations, consistent with the belief that Gilliam was involved in supplying the DTO's operations. On multiple dates during the time alleged in the indictment, Gilliam was observed taking bags to or from a Walbrook Avenue residence identified as a potential stash house for the DTO. This is the same residence where Connors and CC1 were found with fentanyl and a firearm.

Investigators also seized CDS directly from Mr. Gilliam and his vehicle in the Penn-North area in or near the DTO's operating territory. First, in November 2019, investigators seized 50 gelatin capsules from Mr. Gilliam's person (and subsequently arrested him). Investigators approached Mr. Gilliam near the intersection of Pennsylvania Avenue and Cumberland Street—an intersection where the "Bullseye" DTO operated and investigators conducted controlled purchases of fentanyl from some of Mr. Gilliam's co-defendants. Chemical analysis identified fentanyl in the capsules. This seizure is the basis for Count Twelve. Second, upon arresting Mr. Gilliam in September 2020 on the pending charges, investigators seized 76 vials, containing rock-like substances, from Mr. Gilliam's vehicle—the same one he drove the day of the November 2019

7

seizure—parked near the intersection of Pennsylvania and North avenues. Chemical analysis identified the substances from the car as containing cocaine base.

The evidence supporting his culpability for the charged crimes is strong. And the explanation herein is but a summary of only *some* evidence of the charged offenses and Mr. Gilliam's involvement therein. Intercepted cellular phone communications, cellular phone location information, vehicle location information, and surveillance video corroborate the government's case against Mr. Gilliam and his co-defendants.

As this Court is painfully aware, the State of Maryland is in the throes of a vicious opioid epidemic, which is fueled largely by the unlawful distribution of fentanyl. In 2018, over 2,000 Marylanders lost their lives because of opioid-related overdoses. Md. Dep't of Health, REP. ON UNINTENTIONAL DRUG- AND ALCOHOL-RELATED INTOXICATION DEATHS IN MD. (2018), https://bha.health.maryland.gov/Documents/Annual_2018_Drug_Intox_Report.pdf. As such, the nature and circumstances of the offense—and the weight of evidence as to Mr. Gilliam—favor detention.

### B. The history and characteristics of Mr. Gilliam

As noted in the appeal, Mr. Gilliam is a 40-year-old Baltimore native who has lived in the city his entire life. Has two teenage children residing in the Baltimore area.

However, other elements of his history counterbalance, if not outweigh, his ties to the community. As noted in the Pretrial Services Report prepared in advance of the initial detention hearing, Mr. Gilliam has multiple drug trafficking convictions and multiple probation violations. Specifically, he was convicted in 2010 of possession with intent to manufacture/distribute/dispense controlled dangerous substances. After receiving a mostly suspended sentence, he was found guilty in 2013 of violating his probation. Probation was later closed unsatisfactorily in 2015, on the same date he was found guilty of distribution of narcotics.

In addition to the two drug trafficking convictions—and probation violation—within six years of the charged offenses, Mr. Gilliam has a 1998 first degree assault conviction. While dated, it should be noted he was found guilty in 2004 of violation probation for that offense. In sum, Mr. Gilliam has three prior convictions, two of which involved subsequent probation violations.[4] This history does not inspire confidence that Mr. Gilliam would comply with conditions of supervision.

### C. The nature and seriousness of the danger to the community in the event of release

Mr. Gilliam's release would create potential for additional drug trafficking or other unlawful conduct. His past conduct reflects that this conclusion requires no stretch of the imagination. As noted above, he violated probation after a drug trafficking offense by engaging in additional drug trafficking. No less telling, he was arrested in September 2020 in the Penn-North area and in possession of cocaine base even after having fentanyl seized from him in November 2019. Even after the search of his person and searches executed at multiple residences associated with his associates and/or co-defendants, he continued to engage in the same conduct in the same area.

At the time of this response, the government lacks information about the proposed release plan—such as the proximity of the proposed residence to the "Bullseye" DTO's former operating territory and the suitability of the proposed custodian—and thus cannot opine on how that plan might ameliorate the concerns associated with release. The specifics of that plan may be particularly relevant here given that Mr. Gilliam has been diagnosed as contracting COVID-19. *See* ECF 123 at 4.

*     *     *

---

[4] It appears from the report that the 2015 conviction involved a supervision period that expired in October 2019—months after the beginning of the alleged conspiracy.

Consideration of the Section 3142(g) factors should lead to the conclusion that there is no condition or combination of conditions that will reasonably assure the safety of the community should the Defendant be released on a pre-trial basis. Indeed, the Court begins the analysis by presuming detention should be ordered. While such presumption is rebuttable, no individual Section 3142(g) factor favors release. Accordingly, the totality of the factors does not rebut the statutory presumption.

## CONCLUSION

For the foregoing reasons, the Court should affirm the September 16, 2020 detention order.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/
Charles Austin
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2021, I caused a copy of the foregoing to be electronically filed via the Court's CM/ECF system, which will send notice of such filing to all counsel of record.

By: /s/
Charles Austin
Assistant United States Attorney