

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

---

*Charles Austin*
*Assistant United States Attorney*
*Charles.Austin@usdoj.gov*

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4989*
*MAIN: 410-209-4800*
*FAX: 410-962-0717*

September 2, 2021

The Honorable James K. Bredar
United States Chief District Judge
U.S. Courthouse
101 W. Lombard Street
Baltimore, Maryland 21201

      Re:    *United States v. Jerold Gilliam*
              Crim. No. JKB-20-0269

Dear Chief Judge Bredar:

      The government submits this memorandum in anticipation of the September 9, 2021 sentencing in the above-captioned case. For the reasons discussed below, the government recommends a sentence below the advisory guidelines and no greater than 120 months' imprisonment.

## PROCEDURAL HISTORY

      On August 25, 2020, a grand jury in this District returned an indictment charging Jerold Gilliam and several other individuals with a drug trafficking conspiracy and related offenses. ECF 1. The indictment alleged two controlled substances offenses against Mr. Gilliam. *Id.* On June 29, 2021, Mr. Gilliam pleaded guilty to a superseding information charging a conspiracy to distribute and possess with intent to distribute fentanyl, in violation of 18 U.S.C. § 846, and possession with intent to distribute fentanyl, in violation of 18 U.S.C. § 841. ECF 152, 162.

## SENTENCING PROCEDURE

      In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth a multi-step process for imposing sentence in a criminal case. *Id.* at 51-52. A sentencing court should begin by correctly calculating the applicable guidelines range. *Id.* at 49. After providing the parties with an opportunity to present argument, the district court should then consider the factors set forth in 18 U.S.C. § 3553(a). *Id.* at 49-50; *see also United States v. Diosdado-Star*, 630 F.3d 359, 363 (4th Cir. 2011).

## FACTUAL BACKGROUND

      In the summer and fall of 2019, Mr. Gilliam participated in a Baltimore City street-level drug trafficking organization ("DTO") known as "Bullseye"—the name of the products sold by

the group.  Mr. Gilliam's role was primarily one of supplying the street-level shop.  As described more in the parties' factual stipulation, between September and November 2019, Mr. Gilliam discussed by phone various aspects of the trafficking activities and was seen meeting with and supplying other individuals shortly before those individuals engaged in hand-to-hand sales.  Plea Agreement at 10-11, ECF 162.  Intercepted communications of other defendants and participants during the same time period involved references to and discussion about Mr. Gilliam, consistent with his own intercepted statements and recorded actions.

Search warrants at various residences led to the seizure of approximately 400 grams of mixtures containing fentanyl and other substances.  These residences were locations where Mr. Gilliam was observed meeting with others and/or occupied at the time of the searches by co-conspirators who spoke with or about Mr. Gilliam on various phone calls.  In November 2019, upon executing a search warrant, investigators recovered from Mr. Gilliam's person 50 gelatin capsules of a fentanyl mixture.

Not stipulated as part of the plea agreement is that upon his arrest in September 2020, shortly after the indictment date, Mr. Gilliam was in possession of controlled substances near the conspiracy location.  Specifically, federal agents arrested Mr. Gilliam in a park at the intersection of Woodbrook Avenue and W. North Avenue, less than 500 feet from where he and co-defendants were observed trafficking narcotics in 2019.  The agents recovered from his person a key fob to a car he was seen operating during the conspiracy period.[1]  After obtaining a search warrant for the vehicle, investigators recovered 76 vials of what chemical analysis later identified as cocaine base.

## SENTENCING GUIDELINES CALCULATION

In the plea agreement, the parties contemplated a total offense level of 27, the result of grouping offense levels for the two convictions and a three-level reduction for acceptance of responsibility.  *See* Plea Agreement ¶ 6; United States Sentencing Guidelines manual ("U.S.S.G.") §§ 2D1.1(c), 3D1.2(d), 3D1.3, 3E1.1.

As noted in the Presentence Investigation Report ("PSIR"), Mr. Gilliam is subject to the career offender provision in U.S.S.G. § 4B1.1 due to a 1998 first degree assault conviction and drug trafficking convictions in 2008 and 2014.  PSIR ¶¶ 27, 42, ECF 174.  The career offender application increases his offense level to 32 before any reductions and provides a final offense level of 29.  *Id.* ¶ 30.

Regardless of career offender application, Mr. Gilliam's criminal history category is VI.  *Id.* ¶ 42.  Therefore, the advisory guidelines range based on the career offender application is 151-188 months' imprisonment.

---

[1] These and other facts relevant to the arrest were attested to in a search warrant application.  *See* 1:20-mj-2374.

**FACTORS SET FORTH IN 18 U.S.C. § 3553(A)**

Based on the circumstances of this case relevant to the 18 U.S.C. § 3553(a) factors, the government recommends a below guidelines sentence. Mr. Gilliam's convictions involve serious conduct, and his criminal history is substantial. At the same time, the government does not recommend a sentence within the career offender guidelines because the government believes that as to him, a sentence of that length may be greater than necessary to achieve the congressional objectives of § 3553(a). Undersigned counsel joins defense counsel's representation as to the parties' contemplation: this was not a case where the government represented or anticipated seeking application of the career offender guidelines in resolving this matter. Rather, as reflected by the plea, the parties expected a lower offense level; even with that offense level, the government believes that a sentence below the contemplated guidelines is sufficient for Mr. Gilliam.

Nature and Circumstances of the Offense (3553(a)(1))

Mr. Gilliam pleaded guilty to drug trafficking in Baltimore City, specifically, near a major transportation hub linking residential and commercial areas. The DTO sold fentanyl capsules to various individuals—including undercover officers and confidential sources—on a daily basis, for ten to twelve hours a day, during several months in 2019. The Court is, no doubt, cognizant of the various direct consequences and collateral effects of drug trafficking, including deteriorating effects on people and neighborhoods as well as the intersection of violent crimes. *See, e.g.*, *United States v. Carter*, 750 F.3d 462, 470 (4th Cir. 2014) (discussing the links between drugs and violence). Fentanyl has been noted as a particular source of various negative effects on its users. *See* "Fentanyl Safety Considerations", Maryland Occupational Safety and Health, *available at* https://www.dllr.state.md.us/labor/mosh/moshfentanylsafety.shtml (noting that "[f]entanyl is a powerful synthetic opioid analgesic that is similar to morphine but is 50 to 100 times more potent") (last accessed December 22, 2020). For these and other reasons, the courts, legislatures, and other institutions recognize the significant impact of drug trafficking.

Without minimizing these realities and the seriousness of drug trafficking, it is equally fair to note that Mr. Gilliam's conduct did not involve any acts of violence or, unlike some of his co-defendants and co-conspirators, firearms possession.[2]

History and Characteristics of the Offender (3553(a)(1))

Mr. Gilliam's criminal history is significant in that it reflects both apparent acts of violence and multiple drug trafficking charges. As noted above, the conviction history triggers the career offender considerations of the Guidelines. The assault conviction is particularly serious, as Mr. Gilliam was guilty of both first-degree assault and possession of an unregistered shotgun at the age of 16. He received a partially suspended sentence and served about four years before release. He served an additional, apparently relatively brief, period in 2003 and/or 2004

---

[2] Some co-defendants were charged with firearms offenses. *See* ECF 1. Mr. Gilliam was not charged, in any instrument, with violence or firearms possession in connection with the relevant investigation and time period.

for violation his probation terms. *See* PSIR ¶ 35. Between 2008 and 2012, he was incarcerated for drug trafficking; a 2013 probation violation led to additional incarceration on a mostly suspended nine-year term. *Id.* ¶ 37. A 2015 narcotics distribution conviction led to a five-year sentence, approximately three of which he served before mandatory release. *Id.* ¶ 39. His record also reflects marijuana possession and failure to stop convictions that did not result in additional incarceration beyond those periods already described. ¶¶ 36, 38.

But the government also recognizes how the context of those convictions may be equally relevant in finding the appropriate sentence is one below the career offender guidelines range. First, Mr. Gilliam's assault conviction occurred in 1998 and related to conduct occurring when he was 16 years old. Without minimizing the seriousness of the allegations or convictions, this conviction reflects Mr. Gilliam's only violent charge or conviction and occurred while he was still high school age. Since that time, his convictions have been mostly narcotics related. This is a bit of a double-edge sword in that the movement away from violent conduct is positive, but the repeated narcotics violations are not.

The government's recommended sentence would subject Mr. Gilliam to a continuous incarceration period much longer than any he previously experienced. Based on the dates in the PSIR, it appears that while Mr. Gilliam's longest *announced* sentence is 12 years for the 2010 conviction, his longest period of incarceration is about four years—on two different occasions. *See* PSIR ¶¶ 35, 37. Almost all of his sentences were partially, if not mostly, suspended. Considering that, imprisonment for even eight years would subject Mr. Gilliam to twice as long a period of continuous incarceration as he has ever endured.

Also relevant are Mr. Gilliam's history of apparent narcotics use and the circumstances, unfortunately common amongst many Baltimoreans, surrounding his childhood exposures to violence and drug use. *See* PSIR ¶¶ 78-79. As noted in the PSIR, he spent a substantial period of his childhood in the custody of the State of Maryland as a result of various contacts with law enforcement and juvenile adjudications. And it appears he witnessed firsthand the murder of a close friend, in addition to other violence in his neighborhoods. While not being in a position to speak to the specifics of such circumstances and their impact on Mr. Gilliam to the extent defense counsel does, undersigned counsel recognizes that these should be considered along with all other aspects of Mr. Gilliam's history and characteristics.

<u>The Need for the Sentence to Provide Just Punishment for the Offense, to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant (3553(a)(2))</u>

The government's position considers the seriousness of the offense, as described above; imposes substantial punishment; provides a means of deterrence given the sentence exceeds prior periods of incarceration (given that this would not involve suspended time); and protects the public from any additional criminal conduct by Mr. Gilliam for years to come. As noted above, the seriousness of the crime is evident in the facts of the offense, the realities of fentanyl impact in various communities, and types of sentences imposed in drug trafficking cases in this District.

The government's recommendation for Mr. Gilliam also considers his relative culpability to his co-defendants. While they have yet to be sentenced, all but perhaps one co-defendant

4

occupied a lesser position in the conspiracy in that most have more limited roles, focused only on street-level sales or managing a stash house.  From the government's perspective, Mr. Gilliam occupied a higher role in the organizational structure.  Other defendants, by virtue of lesser roles or criminal history, may warrant lower (yet not insubstantial) sentences.  This is part of the reason the parties contemplated, as defense counsel noted, a sentence within the eight-to-ten-year range despite Mr. Gilliam not being in possession of firearms or present at locations where large fentanyl quantities were seized.

*     *     *

In sum, the government believes that sentence no greater than 120 months is appropriate here.  The government's recommendation accounts for Mr. Gilliam's prior convictions and incarceration, and would prevent him from engaging in further drug trafficking, or any conduct affecting Baltimore residents, before his late forties.  The ideal scenario would be that by that time, Mr. Gilliam will be in a position, mentally and physically, to move in a direction different from the drug trafficking that has defined much of the last fifteen years of his life.  A sentence below the advisory guidelines range, and closer to but still below the non-career offender range, will be sufficient to achieve that and other goals in § 3553(a).

I thank the Court for its consideration of this matter.

Very truly yours,

Jonathan F. Lenzner
Acting United States Attorney

_____/s/_____
Charles Austin
Assistant United States Attorney

cc: Michael Lawlor, Esq., counsel for Jerold Gilliam